IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LAURA M.M. R.,[1]

       Plaintiff,                                                Civ. No. 6:21-cv-0968-MC

       v.                                                              OPINION AND ORDER

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

       Defendant.

_____

MCSHANE, Judge:

       Plaintiff brings this action for judicial review of the Commissioner's decision denying her application for disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On November 16, 2017, Plaintiff filed an application for benefits, alleging a disability onset date as of January 24, 2017. Tr. 15, 43.[2] After the administrative law judge ("ALJ") determined Plaintiff was not disabled under the Social Security Act, Plaintiff requested review by the Appeals Council, which declined to review the ALJ's decision. Tr. 1–3. Plaintiff now appeals to the district court.

       Plaintiff argues that the ALJ erred by (1) "failing to properly consider the assessments" of Dr. Michael Lane, M.D., Plaintiff's treating multiple sclerosis specialist; (2) failing to provide

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.

[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

clear and convincing reasons to disregard Plaintiff's symptom testimony regarding her severe fatigue; and (3) failing to consider altogether the lay-witness testimony of Plaintiff's mother and sister, who take care of her on a daily basis. Pl.'s Brief 2. For the reasons below, the Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

## BACKGROUND

Plaintiff is a 44-year-old single mother of three children, currently living with her mother in Eugene, Oregon. Plaintiff was diagnosed with multiple sclerosis ("MS") in April of 2015 after experiencing an eleven-day period of blurry vision in both eyes. Tr. 458. An MRI revealed "three lesions of deep white matter on the left [side of her brain], including left basal ganglia and 1 lesion in the deep white matter of the right hemisphere." Tr. 22, 466. In 2016, an MRI revealed three new lesions on her brain and a 2017 MRI revealed "multiple new flair hyperintense white matter lesions, at least one of which enhances, consistent with active/progressive demyelination since 11/2016." Tr. 22, 760.

Prior to her diagnosis, Plaintiff worked full time for Chico Unified School District as a teacher's aide in a special need's class. Tr. 47. By 2017, Plaintiff's disease symptoms became so severe that she could no longer make it through the workday, and she had to resign. Tr. 47, 50. In January of 2017, Plaintiff left Chico, California and moved in with her mother in Eugene, Oregon. Tr. 46–47. At the time of her relocation, Plaintiff had a 10-month-old infant and was struggling to manage childcare and complete household activities on her own. Tr. 24, 58. Since moving to Eugene, Plaintiff has received daily help from her mother, her sister and brother-and-law who live nearby, as well as Plaintiff's father who stays with them periodically. Tr. 58. The family members all take turns helping with cooking, cleaning, grocery shopping, getting

Plaintiff's children ready for school, and taking Plaintiff to medical appointments. Tr. 58. Plaintiff also relies on her older teenage boys to help with most of the household work. *Id.*

In 2017, Plaintiff established care with Dr. Michael Lane, M.D., a neuroimmunologist and MS specialist at Oregon Health and Science University in Portland, Oregon. Tr. 24. Dr. Lane has regularly seen Plaintiff for over three years and oversees her MS treatments. Tr. 27 Dr. Lane has put Plaintiff on numerous medications including periodic ocrelizumab infusions to help manage her symptoms. Tr. 786. While Plaintiff has experienced periods of disease stabilization and symptom relief, Dr. Lane has opined that Plaintiff will "see a continued decline in function over time." Tr. 725, 764.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial [evidence] means more than a mere scintilla but only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022) (internal quotations omitted). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.* If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful employment since the onset date of her alleged disability. Tr. 18. At step two, the ALJ found that "[Plaintiff] has the following severe impairment: multiple sclerosis (20 CFR 404.1520(c) and 416.971)." *Id.* The ALJ also noted that Plaintiff has optic neuritis "stemming from her multiple sclerosis," ADHD, and underwent a recent gall bladder surgery but listed these conditions as non-severe. Tr. 19. At step three, the ALJ found that Plaintiff's impairments do not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

At this step, the ALJ also formulated the Plaintiff's Residual Functional Capacity (RFC). A claimant's RFC is the most they can do despite their limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ found that Plaintiff can perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b)." Tr. 21.

4 – OPINION AND ORDER

> The claimant can occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. She can stand and/or walk for four hours total in an eight-hour workday, and sit a total of about six hours in a workday. She can occasionally stoop, kneel, crouch, crawl, and climb. The claimant can tolerate occasional exposure to extreme heat and she can occasionally work at unprotected heights.

*Id.* Finally, at step four, the ALJ found that Plaintiff could perform her past relevant work as an Office Assistant, DOT 239.567-010, "which requires Specific Vocational Preparation (SVP) level 2, indicating it is unskilled work, and light exertion." Tr. 30.[3]

## I.   The ALJ's Weighing of Medical Opinions

The Ninth Circuit has clarified that under the new regulations, "the former hierarchy of medical opinions –in which we assign presumptive weight based on the extent of the doctor's relationship – no longer applies." *Woods*, 32 F.4th at 787. Now, an ALJ's "decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.* "The most important factors that the agency considers when evaluating the persuasiveness of medical opinions are *supportability* and *consistency*." *Id.* at 791 (emphasis added) (internal quotations omitted); 20 C.F.R. § 404.1520c(a). However, the Ninth Circuit clarified that "the extent of the claimant's relationship with the medical provider – what we will refer to as "relationship factors"– remains relevant under the new regulations." *Id.* at 790.

Plaintiff contends that the ALJ's decision to dismiss the assessments of Dr. Lane, Plaintiff's long-time treating MS specialist, was not supported by substantial evidence. Pl.'s Brief 3. The Court agrees. The ALJ found that Dr. Lane was Plaintiff's treating MS specialist and that he had a longitudinal relationship with Plaintiff by treating her periodically for over

---

[3] Prior to working as a teacher's aide, Plaintiff worked as an office assistant for an oil trucking company. Tr. 48.

three years. Tr. 27. However, the ALJ found that his opinion was inconsistent with the findings of other medical sources and with his own opinions. *Id*.

In a March 2019 letter, Dr. Lane detailed Plaintiff's symptoms of "significant fatigue, incoordination, neuropathic pain, vision deficits, headaches and cognitive problems which contribute to her deficits and requirement for disability." Tr. 723. A year later, in March of 2020, Dr. Lane submitted a letter describing Plaintiff's MS diagnosis as "severe" and noting that she is "limited in daily activities and is unable to work on a sustained basis." Tr. 725. According to Dr. Lane, Plaintiff's diagnosis "has been confirmed through physical examination, medical history, MRI, and a standard neurological examination." Tr. 725. He further stated that in an eight-hour work day, Plaintiff could "stand less than two hours;" "sit for less than four hours;" required "the ability to change position at-will;" required frequent breaks to rest; could "occasionally lift less than 10 pounds;" should "avoid lifting more than 10 pounds;" would "frequently be off-task due to difficulty concentrating;" and would need to miss at least four days of work per month. Tr. 725. Dr. Lane closed the letter with the following statement:

> In my opinion, [Plaintiff] is unable to resume any type of gainful employment due to physical impairment. Her fatigue, pain, weakness, and other symptoms will significantly and consistently interfere with work performance and attendance. MS is a progressive neurological disorder without a cure. My expectation is that [Plaintiff] will see a continued decline in function over time, lasting longer than 12 months.

*Id*.

The ALJ took note of the statements in the 2020 letter but dismissed Dr. Lane's assessment for several reasons. Tr. 27. First, the ALJ found that Dr. Lane's statement that Plaintiff would "frequently be off task due to difficulty concentrating" was inconsistent with the findings of Dr. Paula M. Belcher, Ph. D, a state psychologist who assessed Plaintiff on May 28, 2019. Tr. 26, 651. After conducting a diagnostic psychological examination and the Wechsler

Adult Intelligence Scale-IV (WAIS-IV) examination on Plaintiff, Dr. Belcher concluded that Plaintiff had "no diagnosis." Tr. 26, 655. Dr. Belcher submitted that Plaintiff's WAIS-IV score placed her in "the average range of general intellectual ability," despite her low "Working Memory" scores and low performance on the Coding subtest. Tr. 655. Plaintiff placed in the thirteenth percentile for Working Memory (WMI), which measures "one's ability to temporarily retain information in memory, perform a mental operation of it, and produce a result. It involves attention, concentration, mental control, and reasoning." Tr. 654. Plaintiff also placed in the eighteenth percentile for Processing Speed (PSI), which measures "one's ability to quickly and correctly scan, sequence, or discriminate simple visual information. It involves short-term visual memory, attention, and visual-motor coordination." Tr. 654–55. Dr. Belcher also concluded that "without a baseline for memory functioning, it cannot be known if her memory has deteriorated since contracting M.S." Tr. 654. The ALJ concluded that Dr. Belcher had strong support for her opinion of "no diagnosis" and "psychological normalcy," while conveniently omitting the portion of Dr. Belcher's findings that revealed Plaintiff's exceedingly low memory and visual-coordination function. Tr. 26. The Court finds that Dr. Belcher's conclusion was not consistent or supported by her findings and that the ALJ erred by using Dr. Belcher's assessment of "no diagnosis" to discredit the consistency of Dr. Lane's findings.[4]

The ALJ also found that Dr. Lane's assessment of Plaintiff's concentration deficit was inconsistent with his own observations from a January 2020 examination where he described

---

[4] Plaintiff also argues that the ALJ fails to show how Dr. Belcher's opinion "regarding her psychological limitations has any bearing" on the extent of Plaintiff's MS-related physical limitations or severe fatigue. Pl's Brief 4. The Court agrees. Comparing the findings of a state psychologist who observed Plaintiff one time to the findings of Plaintiff's longtime treating MS specialist seems nonsensical.

7 – OPINION AND ORDER

Plaintiff as pleasant, "awake and alert, and fully oriented," a "good historian" and exhibiting "normal language function." Tr. 27. This is not a persuasive reason to reject Dr. Lane's assessment. While Plaintiff may have been in a pleasant mood and showed alertness during a brief doctor's visit, this does not contradict Dr. Lane's assessment that Plaintiff would struggle to get through an eight-hour workday, would need to take frequent breaks, and would need to miss four workdays per month. Tr. 725. The ALJ also rejected Dr. Lane's conclusion that Plaintiff can lift less than ten pounds, because in the January 2020 evaluation, Plaintiff's "gait had a normal base and stride," "her walking and motor ability was normal, she could "walk on her toes and heels," and her movements were coordinated. Tr. 27. While these findings suggest that Plaintiff's coordination was intact on that particular day, the ALJ does not show how these findings contradict Dr. Lane's overall impression of Plaintiff's physical strength, or the effect that her chronic fatigue has on her ability to maintain function throughout the workday. Pl.'s Brief 5; Tr. 725.

    The ALJ also concluded that Dr. Lane's opinions in the March 2020 letter were contradicted by a later assessment on September 9, 2020, where plaintiff told Dr. Lane that some of her symptoms had improved, and a recent MRI showed her disease as "stable compared to prior MRI's." Tr. 28, 764. Yet, even with a reduction in symptoms such as dizziness, nausea, neuropathic pain, and motion sensitivity, Dr. Lane noted that Plaintiff "still continues to have fatigue." Tr. 764. A brief period of disease stabilization and fluctuation of symptoms does not negate the progressive nature of Plaintiff's disease. Dr. Lane emphasized in his 2020 letter that MS is a "progressive neurological disorder without a cure," and that Plaintiff will "see a continued decline in function over time." Tr. 725 The ALJ improperly singled out a brief period of Plaintiff's symptom improvement to conclude that Dr. Lane's March 2020 opinion was

inconsistent with his later findings. Tr. 28. "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws.")).

The ALJ's reasons for rejecting Dr. Lane's assessment were not supported by substantial evidence. Tr. 28. Generally, "the decision of the ALJ will not be reversed for errors that are harmless." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). But where a court finds that the disability determination outcome would have been different, if the ALJ properly credited the omitted opinion or testimony, then the error was not harmless. *Id.* at 1055 (to be harmless, the ALJ's error must be "inconsequential to the ultimate non-disability determination"). Here, the ALJ rejected Dr. Lane's opinion that Plaintiff can (1) stand less than two hours and sit only four hours in an eight-hour workday, (2) requires frequent breaks to rest throughout the day, and (3) that she will have to miss at least four days of work in a month. Tr. 725. At a hearing on December 10, 2020, vocational expert Douglas B. Prutting testified that an individual who can stand for less than two hours a day and sit for less than four hours in an eight-hour workday would be unable to sustain full-time employment. Tr. 75. He further opined that an individual who missed four days of work per month and who had to take multiple unscheduled breaks in a day would be "eliminated from competitive employment," and could not perform any of Plaintiff's prior occupations or maintain a similar full-time job. Tr. 76–77. Dr. Lane's assessment renders Plaintiff capable of part-time work at best, and as Mr. Prutting stated, "we only deal with full-time employment." *Id.* Based on Mr. Prutting's testimony, if the ALJ properly

credited Dr. Lane's assessment, she could not have concluded that Plaintiff is capable of performing her past relevant work as an Office Assistant. Therefore, the ALJ's error was not harmless.

## II.     Weighing of Plaintiff's Symptom Testimony

Plaintiff also argues that the ALJ improperly discredited her testimony regarding her fatigue and need to take frequent breaks. Pl.'s Brief 7. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison*, 759 F.3d at 1014.  First, the ALJ determines, "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal citations and quotations omitted). If the first step is satisfied, and the ALJ finds no evidence of malingering, the ALJ next determines the intensity and persistence of symptoms by considering "all of the available evidence from . . . medical sources and nonmedical sources." 20 CFR § 404.1529(c)(1). "The ALJ can reject the claimant's testimony about the severity of her symptoms *only* by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1015 (emphasis added).

At a hearing on December 10, 2020, Plaintiff testified about her multitude of MS symptoms, noting fatigue as her primary limitation. Tr. 46. She explained that when she was still working as a teacher's aide in 2017, she could no longer make it through a full workday and had to take several days off at a time. *Id.* Plaintiff's fatigue has persisted throughout the past three years and Plaintiff stated that she has to "lie down every day, a couple times a day." Tr. 56. Plaintiff also testified that she has optic neuritis which periodically causes her to experience blurry vision, dizziness, and light sensitivity. Tr. 50–52. She also experiences bouts of vertigo,

nerve pain in her head and jaw, daily pins and needles in her hands and feet, and headaches. Tr. 53–60. Plaintiff also testified that she has difficulty with coordination, memory, and problem solving. Tr. 55–56. She testified that her parents, sister, and her teenage sons help with household chores, and that she occasionally accompanies a family member to the grocery store, but that she has to "sit down pretty quickly," and "can't make it through the whole thing." Tr. 58–61.

The ALJ found that "a person could reasonably expect" Plaintiff's condition of MS to cause some of her alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms" were inconsistent "because objective medical evidence does not support all the claimant's statements." Tr. 21–22. But a claimant alleging symptoms "need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). And the objective medical evidence here reflects Plaintiff's consistent reports of severe fatigue, weakness, vision issues dizziness, and pain over a three-year period. Tr. 21, 91, 95, 102, 106, 113, 130, 132, 143, 155, 512, 606, 613, 630, 662, 670, 775, 764, 778, 786, 787.

Nevertheless, the ALJ found that despite Plaintiff's unquestionable diagnosis of MS, she retains "a high level of functionality." Tr. 22. The ALJ points to a singular occasion, where Plaintiff drove herself to her psychological examination with Dr. Belcher on May 28, 2019. Tr. 22. But evidence that Plaintiff briefly drove herself to an appointment does not negate her testimony of fatigue or a need to lie down throughout the day. The ALJ also cited that Plaintiff "car[es] for her three children, including her young son, now age 4." Tr. 25–26. The ALJ understates the fact that two of Plaintiff's children are teenagers and that she relies on them to

help with cleaning, cooking, and managing their own activities. Tr. 58. The ALJ also noted that Plaintiff was "able to relocate" from California to Oregon in January of 2017, and that she had a ten-month-old son that she continued to nurse. Tr. 24. The ALJ stated,

> the claimant's ability to care for her young son, including nursing him, reflects that she was able to pick him up and hold him, position him, when he was nursing. Additionally, she was able to change his diapers, where she again had to lift and carry him to do so. Her ability to do so is not inconsistent with work of the light exertion level.

*Id*. The ALJ seems to imply that Plaintiff had some choice in the matter of feeding her child, and that if she could nurse a ten-month-old infant and change his diapers – irrespective of the physical toll it may have had on her – than she can certainly perform a 40-hour work week at the light exertion level, which involves standing and walking for four hours in an eight-hour workday. The Court is not persuaded by the ALJ's discrediting of Plaintiff's fatigue symptoms simply because Plaintiff chose to feed her infant son.

The ALJ next noted that Plaintiff only sees Dr. Lane at "regularly scheduled routine visits" and the record shows "no emergent or urgent visits." Tr. 25. Plaintiff has been battling her MS symptoms for several years; there is nothing unexpected or novel about her chronic fatigue. It is unclear why Plaintiff would need to show emergency visits to Dr. Lane to make her symptom testimony more reliable. In any event, Plaintiff was in constant communication with Dr. Lane from 2017 to 2020 and the record indicates numerous non-scheduled phone calls between Plaintiff and Dr. Lane to discuss her symptoms and medication adjustments. Tr. 516, 521, 522, 630, 631, 666, 672.

The ALJ further noted that "the record does not support that [Plaintiff] was getting the assistance of her mother" because "from the record, she was living in an apartment, and not with

her mother." Tr. 26. The ALJ also states that Plaintiff's dad was living with her "for his benefit, as she noted he was no longer depressed, and played with the grandchildren a lot." *Id.* From this the ALJ concluded, "all of this [sic] are inconsistencies, and do not support a finding that she is totally unable to work. *Id.* The ALJ's reasoning is not supported by substantial evidence. First, the ALJ relies on a single note in July of 2018, where Kristin Dissinger, P.T., stated that Plaintiff lives with her children in Eugene in a "single level apartment." Tr. 721. This chart note is inconsistent with the entire administrative record that overwhelmingly shows that Plaintiff lives at her mother's house in Eugene.[5] The note was likely made in error, yet the ALJ used it against Plaintiff to conclude that she is not supported by her mother and therefore, she can work.

      Second, the ALJ cites to a chart note where Plaintiff indicates "[h]er dad is currently living with her, says he is no longer depressed - He plays with his grandchildren a lot." Tr. 786. The ALJ construes this as showing that Plaintiff's father only plays with the kids for his benefit, and thus does not offer real assistance to Plaintiff. Tr. 786. Nowhere in the record does Plaintiff state that this was for her father's "benefit." She does state however, that her entire family, including her father, helps out and that her father "often stays with us and stays between my sister's house and my house, depending on who's around helping." Tr. 58.

      The ALJ also found that Plaintiff "has been working since her alleged onset date" managing her mother's properties, working on a teaching license, and tutoring. Tr. 25–26. Plaintiff explained at the hearing that when she first moved in with her mother in 2017, she tried

---

[5] See Tr. 20 ("The claimant told Dr. Belcher that she lived with her three sons at her mother's house."); Tr. 130 ("lives with 3 sons, ages 3-16 in her mother's house"); Tr. 500, 502, 506 ("Living Situation: with mother"); Tr. 651 ("She lives with her three sons and her mother and is unemployed."); Tr. 654 (The client lives with her three sons at her mother's house"), *etc*.

13 – OPINION AND ORDER

to help out with managing her mother's rental property for two to three hours per week, "sometimes not at all," and that she soon had to stop helping completely. Tr. 63, 70. Plaintiff's mother confirmed in a 2020 letter that, "5 years ago, [Plaintiff] was able to help me with my rental properties for a few hours a week, but now she drops things and has become increasingly forgetful, she has severe fatigue and her arms and legs are very weak." Tr. 450. Plaintiff's mother continued, "I help her in all aspect [sic] of life." Tr. 450. Plaintiff also testified that when she moved to Oregon she made a single attempt to tutor a college student and had to stop after the first session because of her declining cognitive abilities. Tr. 65. During this same time in 2017, Plaintiff also began efforts to earn a substitute teaching license, but as her symptoms progressed it soon became apparent that this was an unrealistic endeavor. *Id.* She never went through with procuring a license. *Id.* In sum, Plaintiff made some futile attempts to find part-time employment when she first moved in with her mother, but she was ultimately unable to work at all. Looking for part-time work is not inconsistent with a claimant's disability allegations. *Carmickle v. Comm'r,* 533 F.3d 1155, 1161-62 (9th Cir. 2008) (internal citations omitted). The ALJ even stated that Plaintiff's minimal "work activity did not rise to the level of substantial gainful activity." Tr. 18.

Finally, the ALJ found some evidence that Plaintiff "is not fully compliant with treatment recommendations." Tr. 25. The regulations state that an ALJ may find inconsistencies when an "individual fails to follow prescribed treatment that might improve symptoms," however,

> we will not find an individual's symptoms inconsistent with the evidence in the record on this basis *without considering possible reasons he or she may not comply with treatment* . . . [w]e may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

14 – OPINION AND ORDER

SSR 16–3p, 2017 WL 5180304, at *9 (emphasis added). The ALJ notes that Plaintiff started taking 100 mg of amantadine per day in 2020 to help with her fatigue, and at a September 2020 visit with Dr. Lane, she still reported fatigue but had not increased her amantadine to 200 mg, "as noted at the prior visit." Tr. 25. At the prior visit in August of 2020, Dr. Lane's chart note states "[w]e discussed management considerations and will start amantadine 100 mg daily and increase in 1 week to 200 mg daily *as tolerated*." Tr. 710 (emphasis added). The ALJ never asked Plaintiff why she did not increase her dosage of amantadine. However, in January of 2020, Plaintiff reported to Dr. Lane, that even 100 mg of amantadine "makes her feel sick," which shows her possible hesitancy in increasing the medication dosage. Tr. 786. Nevertheless, Plaintiff agreed to trial the 200 mg increase at her September 2020 appointment with Dr. Lane, and the ALJ cites no evidence in the record that Plaintiff later failed to comply. Tr. 764.

The ALJ did not offer clear and convincing reasons to discredit Plaintiff's symptom testimony regarding her severe fatigue and reliance on family members to support her with everyday tasks. A proper weighing of Plaintiff's symptom testimony in conjunction with Dr. Lane's assessment would have supported a finding that Plaintiff is disabled.

### III.     Weighing of Lay Witness Testimony from Nonmedical Sources

Finally, Plaintiff argues that the ALJ erred by failing to consider lay witness testimony from Plaintiff's mother and sister. Pl.'s Brief 18. The ALJ "is required to provide specific reasons for rejecting lay testimony." *Stout*, 454 F.3d at 1054. In *Stout*, the Ninth Circuit specified that an "ALJ's silent disregard of [] lay testimony contravenes our case law and the controlling regulations[.]" *Id.* Therefore, where an ALJ erroneously fails to discuss "competent lay testimony favorable to the client," the error is considered prejudicial unless "no reasonable

15 – OPINION AND ORDER

ALJ, when fully crediting the testimony, could have reached a different disability determination. *Id.* at 1056. Here, Plaintiff's sister submitted a third-party function report on November 5, 2019, and Plaintiff's mother wrote a letter in 2020. Tr. 406–412, 450. Both documents corroborated Plaintiff's symptom testimony and described how the family members support Plaintiff with her daily tasks. Tr. 406–412, 450. Yet, the ALJ failed to even mention these statements in her findings. The ALJ's omission of this relevant testimony was not harmless, because the testimony supports the conclusion that Plaintiff is dependent on her family members to manage daily activities and that she cannot sustain substantial gainful employment. An ALJ that fully credited this testimony would find that Plaintiff is disabled.

## **CONCLUSION**

The Court finds that the ALJ erred by failing to properly weigh Dr. Lane's objective medical assessment, Plaintiff's symptom testimony, and third-party lay testimony. These errors were not harmless. The Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

IT IS SO ORDERED.

DATED this 20th day of December, 2022.

/s/ Michael J. McShane
Michael McShane
United States District Judge